IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MARY BARKER MATLOCK, Administratrix )
of the Estate of JAMES ROBERT BARKER, )
JR., Deceased; and PATRICIA L. )
MCDONOUGH )
                                     )
          Plaintiffs,                )
                                     )
     v.                              )   No. 1:08-CV-696
                                     )
PITNEY-BOWES, INC. and PITNEY-       )
BOWES, INC. EMPLOYEE BENEFITS        )
COMMITTEE                            )
                                     )
          Defendants.                )


MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

     This is an action for retirement benefits pursuant to the

Employee Retirement Income Security Act of 1974, 29 U.S.C. §

1101 et seq. ("ERISA"). Defendants Pitney Bowes Inc. ("Pitney

Bowes")[1] and Pitney Bowes Inc. Employee Benefits Committee

("Benefits Committee"), move for summary judgment pursuant to

Federal Rule of Civil Procedure 56. (Doc. 21.) For the reasons

set forth herein, the motion will be granted.

## I.   BACKGROUND

     Plaintiffs Mary Barker Matlock, administratrix of the

estate of James Robert Barker, Jr. ("Barker"), and Patricia L.

---

[1] Defendants note that the proper corporate name is Pitney Bowes Inc.,
with no hyphen or comma.

McDonough ("McDonough") filed this action in Guilford County Superior Court on August 28, 2008. McDonough alleges she is the designated beneficiary on Barker's retirement account at Pitney Bowes and the parties agree that the lawsuit involves solely a claim for benefits and attorneys' fees under ERISA, 29 U.S.C. § 1132(a)(1)(B) and § 1132(g). (Docs. 2, 19.) Defendants timely removed the action to this court on the ground that Plaintiffs' state law breach of contract claim is preempted and displaced by ERISA. Darcangelo v. Verizon Communications, Inc., 292 F.3d 181, 194 (4th Cir. 2002).

### A.    The Plan

Pitney Bowes maintains a defined benefits pension plan ("the Plan"). The Plan is funded by Pitney Bowes, and its assets are held in a separate qualified trust for the sole benefit of the Plan participants and beneficiaries without any possibility of reversion to Pitney Bowes in this case. (Doc. 20, Administrative Record ("A.R.") at 51-52 ¶¶ 9.1-9.3.) An independent party, State Street Bank and Trust Co., serves as Plan trustee, and the Plan is administered by its Benefits Committee. All claims for Plan benefits are paid out of its qualified trust and not out of Pitney Bowes' assets.

The Plan grants the Benefits Committee the following authority to interpret and administer the Plan:

[T]he Committee shall be responsible for the administration of the Plan. The Committee shall have all powers necessary or appropriate to carry out the provisions of the Plan. It may, from time to time, establish rules for the administration of the Plan and the transaction of the Plan's business.

In making any determination or rule, the Committee shall pursue uniform policies established by the Committee. It shall not discriminate in favor of or against any Member. The Committee shall have the exclusive right to make any finding of fact necessary or appropriate for any purpose under the Plan including, but not limited to, the determination of the eligibility for and the amount of any benefit payable under the Plan.

The Committee shall have the exclusive right to interpret the terms and provisions of the Plan and to determine any and all questions arising under the Plan or in connection with its administration, including, without limitation, the right to remedy or resolve possible ambiguities, inconsistencies, or omissions, by general rule or particular decision, all in its sole and absolute discretion. The Committee shall make, or cause to be made, all reports or other filings necessary to meet the reporting, disclosure, and other filing requirements of ERISA that are the responsibility of "plan administrators" under ERISA.

Any exercise of these powers by the Committee shall be conclusive and binding upon all persons having or claiming to have any interest or right under the Plan and shall be given the maximum possible deference allowed by law.

(A.R. at 54 ¶ 10.8.)

Under the Plan, the normal retirement age is age 65. (A.R. at 18 ¶ 2.33(a).) Any time after a participant attains age 55 and has completed ten years of company service, however, he or she has reached an "Early Retirement Age" and is eligible to select an "Early Retirement Date" and "Annuity Starting Date."

(Id. at 18 ¶ 2.33(b).) An "Early Retirement Date" is "the first day of the month coinciding with or next following the [participant's] Termination of Service after his or her Early Retirement Age." (Id. at 18-19 ¶ 2.34(c).) "Termination of Service" means "the last date on which an individual performs duties, or for which he is directly or indirectly compensated (by the payment of wages or otherwise) as an Employee of the Company or an Affiliate." (Id. at 20 ¶ 2.40.) An "Annuity Starting Date" is "in the case of a benefit payable in the form of a single sum payment, the date on which all events occurred that entitle the Member to the benefit." (Id. at 9 ¶ 2.4(b).) Thus, for a Plan participant who chooses to retire before age 65, his Early Retirement Date would typically also be his Annuity Starting Date.

For an unmarried participant, the Plan provides several optional forms of distribution, including a lump sum. (Id. at 32-36 ¶ 5.1 and ¶ 5.3(g).) If a participant elects an optional form of payment, such as a lump sum, and dies before his Annuity Starting Date, the Plan declares his election null and void. (Id. at 36 ¶ 5.3.) Further, if the participant is unmarried and dies before his Annuity Starting Date, no pre-retirement death benefit shall be paid. (Id. at 47-48 ¶ 8.1(b).)

**B.     Barker's Benefits Claim**

Barker began his employment with Pitney Bowes on January 8, 1968.  On January 8, 1973, he vested as a participant in the Plan.[2]  He became seriously ill in early 2005 and on February 7, 2005, following a diagnosis of late stage colon cancer, took a medical leave of absence during which he began receiving short term disability benefits.  On July 11, 2005, his short term benefits were converted to long term disability benefits.  He continued to receive long term disability benefits until his death on September 12, 2006.

On several occasions following his cancer diagnosis, Barker requested of Pitney Bowes, and Pitney Bowes sent, different packages (each bearing a unique identifier to distinguish it) relating to his potential retirement and benefits calculated as of the time.  These included a March 22, 2005, retirement packet that corresponded to a retirement/Annuity Starting Date of May 1, 2005.  Barker did not execute and return this packet.  Over one year later, Barker requested and was sent a June 30, 2006, retirement packet for retirement/Annuity Starting Date of September 1, 2006, and which estimated his lump sum retirement benefits in the amount of $304,608.11.  Again, Barker did not execute and return the packet.

---

[2]     Barker maintained a separate account in the Pitney Bowes 401(k) Plan, which is not the subject of this suit.

On July 31, 2006, Barker spoke to his disability case manager at Pitney Bowes and notified her that he decided to retire effective October 1, 2006. (Id. at 211.) On August 10, 2006, Pitney Bowes sent Barker a retirement packet. On a section titled "For Company Use Only" the materials noted a "Service Accrual End Date" of September 30, 2006, a "Retirement Date" of October 1, 2006, and that the "Retirement Type" was "Early Ret." (Id. at 100.) The forms also estimated his lump sum benefits in the amount of $305,182.33. (Id. at 126.)

On August 29, 2006, Barker met with a representative of Metropolitan Life Insurance Company ("MetLife") and executed all the Pitney Bowes documents in the packet as well as a Metropolitan Life form authorizing the rollover of his pension benefits into an Individual Retirement Account ("IRA") at MetLife. (Id. at 186.) On the MetLife form, Barker listed his Pitney Bowes pension as his only asset and checked the box that requested that "all assets" be transferred to the IRA "immediately."[3] (Id. at 198.) All documents were mailed to Pitney Bowes.

On September 12, 2006, Pitney Bowes received Barker's executed forms. These included an "Option Election Form" that Barker signed and had notarized wherein he elected a lump sum

---

[3] The only other alternative on the Met Life form was to check the box that required the applicant to designate a maturity date for the rollover. (A.R. at 146.)

distribution and a "Pitney Bowes Pension Plan Pension Payroll Authorization Form" executed by Barker that stated a "Service Accrual End Date" of September 30, 2006, and a "Retirement Date" of October 1, 2006. The Option Election Form estimated a lump sum distribution of $305,182.33 and contained the specific identifier "pencalc877." (Id. at 126-27.)

That same day, September 12, 2006, Barker died. He was unmarried.

Following Barker's death, Plaintiffs inquired of Pitney Bowes as to their right to obtain his benefits under the Plan. (See A.R. at 111-12.) Pitney Bowes responded that because Barker died prior to his retirement/Annuity Starting Date of October 1, 2006, no benefits were due. (Id.) Thereafter, the Benefits Committee formally denied Plaintiffs' claim. (Id. at 113-55.)

Plaintiffs appealed, and the Benefits Committee, after considering Plaintiffs' arguments, denied their claim at a May 5, 2009, meeting, and the decision was explained in a May 27, 2009, letter to Plaintiffs. (Id. at 113-56, 161-64.) The Benefits Committee concluded that during the time Barker received short term and long term disability benefits, he remained an active employee of Pitney Bowes until his death on September 12, 2006. Because he elected his retirement/Annuity Starting Date of October 1, 2006, and was unmarried at the time

of his death, the Benefits Committee concluded, Barker was not entitled to any benefits under the Plan. (Id. at 162-64.)

Plaintiffs' action now before this court followed. Defendants moved for summary judgment pursuant to Federal Rule of Civil Procedure 56 on the ground that the Plan unambiguously provides that Plaintiffs are not entitled to any benefits in the case.

## II. ANALYSIS

### A. Standard of Review

Summary judgment is appropriate when, after adequate time for discovery, a party has failed to make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists when there is sufficient evidence on which a reasonable jury could return a verdict in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). Where an adverse party "fails to bring forth facts showing that reasonable minds could differ on a material point then, regardless of any proof or evidentiary requirements imposed by the substantive law, summary judgment, if appropriate, shall be entered." Bouchat v. Balt. Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir.

2003) (internal quotation marks, alteration marks, and citations omitted).[4]

Plaintiffs contend that this court should make a *de novo* determination whether to grant them benefits under the Plan. Plaintiffs urge that the Plan is ambiguous as to whether discretionary authority exists for the Benefits Committee to grant or deny benefits, citing Heasley v. Belden & Blake Corp., 2 F.3d 1249, 1257-58 (3d Cir. 1993). They argue that fiduciary acts are ordinarily to be assessed *de novo* unless the Plan provides otherwise, citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111-13 (1989), and Metropolitan Life Insurance Co. v. Glenn, 554 U.S. 105, __, 171 L.Ed.2d 299, 306-07 (2008).

Contrary to Plaintiffs' contentions, and as Defendants correctly point out, the Plan clearly grants the Benefits Committee discretion to construe the terms of the Plan and make decisions whether to award or deny benefits. As noted earlier, the Plan grants the Benefits Committee

_____

[4] At least one circuit concludes that the court's abuse of discretion review requires it to make a determination "akin to a credibility determination about the plan administrator's decision to deny benefits" such that findings of fact and conclusions of law should be made under Federal Rule of Civil Procedure 52. See Burke v. Pitney Bowes Inc. Long Term Disability Plan, 640 F. Supp. 2d 1160, 1170 (N.D. Cal. 2009) (internal quotation marks omitted), aff'd, No. 09-16608, 2010 WL 3258596 (9th Cir. Aug. 18, 2010). Because the parties do not urge this court to do so and it does not appear to be required in this circuit, cf. Bynum v. Cigna Healthcare of N.C., Inc., 287 F.3d 305, 311 n.14 (4th Cir. 2002), abrogation on other grounds recognized by Carden v. Aetna Life Ins. Co., 559 F.3d 256, 260 (4th Cir. 2009), the court declines to do so.

all powers necessary or appropriate to carry out the provisions of the Plan. . . the exclusive right to make any finding of fact necessary or appropriate for any purpose under the Plan including, but not limited to, the determination of the eligibility for and the amount of any benefit payable under the Plan. . . [and] the exclusive right to interpret the terms and provisions of the Plan and to determine any and all questions arising under the Plan or in connection with its administration, including, without limitation, the right to remedy or resolve possible ambiguities, inconsistencies, or omissions, by general rule or particular decision, all in its sole and absolute discretion. . . . Any exercise of these powers by the [Benefits] Committee shall be conclusive and binding upon all persons having or claiming to have any interest or right under the Plan and shall be given the maximum possible deference allowed by law.

(A.R. at 54 ¶ 10.8.)  This language is sufficient to invoke an abuse of discretion standard of review.  See, e.g., Evans v. Eaton Corp. Long Term Disability Plan, 514 F.3d 315, 321 (4th Cir. 2008) (finding that provisions granting administrator "discretionary authority to determine eligibility for benefits" and "the power and discretion to determine all questions of fact . . . arising in connection with the administration, interpretation and application of the Plan" unambiguous and sufficient to trigger abuse of discretion standard of review); Booth v. Wal-Mart Stores, Inc., 201 F.3d 335, 343-44 (4th Cir. 2000) (finding that provisions granting administrator "complete discretion to interpret the provisions of the Plan, make findings of fact, correct errors, and supply omissions" and providing that such decisions and interpretations would be

"final, conclusive and binding" triggered abuse of discretion standard); de Nobel v. Vitro Corp., 885 F.2d 1180, 1186 (4th Cir. 1989) (finding abuse of discretion standard appropriate where plan gave the administrator responsibility "for the operation and administration of the Plan" including authority to "determine all benefits and resolve all questions pertaining to the administration, interpretation and application of Plan provisions").

Plaintiffs further argue that the Plan operates under a conflict of interest insofar as the employer both funds the Plan and evaluates the claims. They contend that this conflict mandates a *de novo* standard of review. Defendants contend that there is no conflict of interest, noting that all Plan assets are held in a separate qualified trust for the sole benefit of participants and beneficiaries without the possibility of any reversion to Pitney Bowes, a disinterested third-party (State Street Bank & Trust Co.) acts as trustee, all benefit claims are paid from the trust and not from any of Pitney Bowes' assets, and no Benefits Committee member holds any employment position at Pitney Bowes which involves day-to-day oversight of the Plan's or Trust's financials. Defendants further argue that Plaintiffs have not provided any evidence that either Pitney Bowes or any member of the Benefits Committee has any incentive, financial or otherwise, to deny claims for benefits under the

Plan and contends, consequently, that no conflict of interest exists, relying on Guthrie v. National Rural Electric Coop. Ass'n Long-Term Disability Plan, 509 F.3d 644, 649-50 (4th Cir. 2007) (finding no conflict of interest to jeopardize abuse of discretion standard where benefits were paid out of a separate trust fund in which the employer held no reversionary interest and thus had no incentive to deny claims), abrogation on other grounds as recognized by Williams v. Metro. Life Ins. Co., 609 F.3d 622 (4th Cir. 2010).

In the present case, the record is far from robust on the make-up of the Benefits Committee and the functioning of the trust. It is apparent, however, that Pitney Bowes both funds the Plan and that its Benefits Committee, which is composed (at least in part – the record not being clear) by Pitney Bowes employees, evaluates claims against it. The Supreme Court recently held in Metropolitan Life Insurance Co. v. Glenn, 554 U.S. 105, 112 (2008), that an employer who both funds the plan and evaluates the claims operates under a conflict of interest. This is because "every dollar provided in benefits is a dollar spent by . . . the employer; and every dollar saved . . . is a dollar in the employer's pocket." Id. (brackets omitted). The Court even concluded that the retention of a professional insurance company as plan administrator did not eliminate the conflict of interest. Id. at 114. After Glenn, therefore, a

conflict of interest is "readily determinable by the dual role of an administrator or other fiduciary." <u>Champion v. Black & Decker (U.S.) Inc.</u>, 550 F.3d 353, 359 (4th Cir. 2008).

That the Plan maintains a separate trustee and that none of Pitney Bowes' employees on the Benefits Committee holds any employment position at Pitney Bowes involving day-to-day oversight of the Plan's or Trust's financials does not eliminate the apparent fact that every dollar the Benefits Committee saves reduces the company's burden to pay into the Plan in the future. Further, even though no unused trust funds revert to Pitney Bowes, the Plan is a defined benefits plan that appears to require that any funds forfeited by an employee be used to reduce Pitney Bowes' future contributions to the Plan.[5] (A.R. at 51.) Thus, the court will assume, without expressly holding, that a conflict of interest exists. <u>Accord</u> <u>Burke v. Pitney Bowes Inc. Long Term Disability Plan</u>, 640 F. Supp. 2d 1160 (N.D. Cal. 2009) (finding structural conflict of interest under Pitney Bowes disability plan where employer funded the trust and employer-committee administered the plan, noting that the more

---

[5]  Defendants do not contend that the Plan is fully funded.  <u>Cf.</u> <u>de Nobel</u>, 885 F.2d at 1191 (finding "[t]hat plan administrator decisions have had a favorable impact on the balance sheet of the trust itself . . . suggests no 'conflict of interest'" where the plan is fully funded); <u>Parsons v. Power Mountain Coal Co.</u>, 604 F.3d 177, 184 (4th Cir. 2010) (noting that a defined *contribution* plan presents no conflict because employer contributions remain constant irrespective of the payout and if funds run out, the detriment affects the employees whose benefits are modified).

the trust pays out in benefits the more the company must contribute), aff'd, No. 09-16608, 2010 WL 3258596 (9th Cir. Aug. 18, 2010).[6]

However, contrary to Plaintiffs' contention, any conflict of interest does not mandate *de novo* review. Under Glenn, the Plan continues to enjoy an abuse of discretion standard of review. Conkright v. Frommert, 130 S. Ct. 1640, 1646 (2010) (noting that "when the terms of a plan grant discretionary authority to the plan administrator, a deferential standard of review remains appropriate even in the face of a conflict"). The conflict of interest becomes one factor to be considered along with others. See, e.g., Carden v. Aetna Life Ins. Co., 559 F.3d 256, 261 (4th Cir. 2009). Those other factors include: (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any

---

[6]  In a previous opinion in that case, the Ninth Circuit left for another day the effect, if any, of the fact that the plan is jointly administered by the employer and employee representatives. Burke v. Pitney Bowes Inc. Long-Term Disability Plan, 544 F.3d 1016, 1027 n.12 (9th Cir. 2008).

external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have. Id. (citing Booth, 201 F.3d at 342-43).

Under an abuse of discretion review, a court must "show enough deference to a primary decision-maker's judgment that the court does not reverse merely because it would have come to a different result in the first instance." Evans, 514 F.3d at 322. The "standard equates to reasonableness: We will not disturb an ERISA administrator's discretionary decision if it is reasonable, and will reverse or remand if it is not." Id. An administrator's decision is reasonable "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." Bernstein v. CapitalCare, Inc., 70 F.3d 783, 788 (4th Cir. 1995). To be reasonable, an administrator's decision must adhere both to the text of ERISA and the Plan, rest on good evidence and sound reasoning, and result from a "fair and searching process." Evans, 514 F.3d at 322-23.

### B. The Benefit Committee's Decision

The court finds that Plaintiffs have failed to demonstrate a genuine issue of material fact that the Benefits Committee abused its discretion in deciding to deny benefits under the Plan. There is no dispute that Barker executed retirement forms that selected October 1, 2006 as his retirement/Annuity Starting

Date.  The Option Election Form he signed and had notarized elected a lump sum distribution of $305,182.33, an amount that corresponded exclusively to an October 1, 2006 (and not a September 1, 2006) Retirement Date.  The Pitney Bowes Pension Plan Pension Payroll Authorization Form he executed also expressly stated that his Retirement Date would be October 1, 2006.  In addition, there is evidence that Barker told his long term disability manager for Pitney Bowes that he elected to retire effective October 1, 2006, which caused the generation of the various forms he executed.  (A.R. at 211.)

The Benefits Committee found that Barker, who continued to accrue service credit under the Plan and be paid disability benefits, remained an active employee of Pitney Bowes up until his death on September 12, 2006.  (A.R. at 161-64.)  The Benefits Committee also concluded that the evidence indicated that Barker intended to retire effective October 1, 2006.  (Id.) Therefore, the Benefits Committee concluded, under paragraph 5.3(g) of the Plan, that Barker, who elected an optional form of payment (i.e., a lump sum) and died before his Annuity Starting Date, had his election declared null and void, and any pre-retirement death benefit was forfeited under paragraph 8.1(b) insofar as he was unmarried at the time of his death.

Plaintiffs had argued to the Benefits Committee that Barker had terminated his employment sometime in March 2005 when he

"ceased performing services" for Pitney Bowes. (Id. at 114-16.)
Thus, Plaintiffs argued, he was no longer an active employee
with the company. As to this argument, the Benefits Committee
noted that Barker received short term disability benefits
beginning February 14, 2005, which were converted to long term
disability benefits beginning July 11, 2005, and continuing up
to his death.[7] This entitled him to receive, among other things,
health benefits for his cancer treatment throughout this period.
Accordingly, the Benefits Committee concluded, Barker was an
active employee of the company when he died on September 12,
2006. (Id. at 162 ¶ 3.)

Plaintiffs' argument is also contrary to the facts. After
March 2005, Barker requested and was mailed two different
retirement packets but for over a year did not complete either
of them. Had Barker considered himself retired, he would not
have delayed in both declaring so and receiving his retirement
benefits. Indeed, Plaintiffs' affidavit of J.C. Aller
("Aller"), the MetLife employee who advised Barker as to his
investments and who met with him on August 29, 2006, states that
Barker said in an August 18, 2006, meeting that he (Barker)
"would have to be retiring from Pitney-Bowes" and they discussed

---

[7] Pitney Bowes relied on a copy of the long term benefits notice sent
to employees like Barker, which notes that an employee will be
"terminated from active employment status" "after a period of two
years of receiving LTD benefits." (A.R. at 214-15.)

taking the retirement in a lump sum. (Id. at 185-86.) This indicates that Barker considered himself an active employee. Moreover, the Summary Plan Description notes that a lump sum payment is not available if the participant defers his benefit, which Barker in effect would have done had he actually retired in March 2005. (Id. at 216 ("*Lump sum payments are not available if you defer payment of your benefits.* So, if you want a lump sum payment, you must make your decision within 30 days of your retirement date.").)

Plaintiffs also argued that when Barker executed his retirement forms on August 29, 2006, he requested the lump sum benefits "immediately." (Doc. 23 at 7; see A.R. at 198.) Plaintiffs argue that under "well-known principles," this submission became effective "at the moment of its posting" so that Barker's Early Retirement Date would be September 1, 2006, the next day of the month following his Termination of Service. (Doc. 23 at 7.) As to this argument, the Benefits Committee noted that it was bound by the terms of the Plan as well as the express provisions of the documents Barker executed. (A.R. at 162-64 ¶¶ 9-10.) Importantly, this notation for "immediate" rollover into his IRA was made on the MetLife form and not the Pitney Bowes election forms. The Benefits Committee observed, moreover, that Plaintiffs' affidavit of Aller (the MetLife employee who met with Barker several times, including on August

29, 2006, when he executed his documents) stated that
"[t]hroughout, Mr. Barker was aware, attentive and asked
appropriate questions. It seemed clear to me he was aware of
what he was doing and the consequences of his actions." (Id. at
164; see id. at 186.)

In this court, Plaintiffs attempt to dismiss the importance
of Barker's receipt of short term and long term disability
benefits, arguing that "the erroneous payment, receipt, and
retention of those benefits in no way negates the admission by
defendants as to Mr. Barker's specified retirement date." (Doc.
23 at 7.) Plaintiffs also seek to downplay what they
characterize as "subtle features of the timing and content of
documents submitted by Mr. Barker." (Id. at 9.) Plaintiffs
contend that it is "fairly clear" that Barker intended to submit
an earlier package with a retirement date of September 1, 2006,
because he requested that the benefits be effective
"immediately" but then "mistakenly" submitted the October 1,
2006 package. (Id.)

This version of the events is simply contrary to the
express terms of all the documents. As noted by the Benefits
Committee, in 2006 under the Plan an employee of Pitney Bowes
who received short term and long term benefits continued to
receive compensation, to accrue service credit under the Plan,
and to be classified as an "active employee." (A.R. at 10 ¶

2.11(b)(1); id. at 20 ¶ 2.40 (noting that "termination of service" is "the last date on which an individual performs duties, or for which he is directly or indirectly compensated (by the payment of wages or otherwise) as an Employee," whether or not performing duties), 213-15 (noting that after receiving long term benefits for two years "you will be terminated from active employment status").) Moreover, as the Benefits Committee noted, Barker had significant incentive to remain an active employee: to maintain his long term disability benefits and active medical coverage for the expense of his cancer treatment. (Id. at 164; see id. at 215 (noting effects of termination).) Unfortunately for him, he simply misjudged how long he could continue to remain an active employee and receive these benefits before making his retirement election effective (which would shift the cost of his health coverage to himself).

Plaintiffs further argue that Defendants could not have exercised their discretion lawfully because the Benefits Committee expressed a desire to grant benefits but concluded it was legally precluded from doing so. Plaintiffs point to the minutes of the Benefits Committee meeting, which provided that "the members were sympathetic of Barker's position and looked for appropriate ways to remedy the situation." (Id. at 164.) Plaintiffs argue that this is evidence that the Benefits Committee lacked the discretion to pay benefits in this

circumstance and thus should not be entitled to an abuse of discretion review. This argument is unpersuasive. That the Plan sets forth rules that the Benefits Committee must apply does not otherwise vitiate the discretion it is vested for making decisions. See Colucci v. AGFA Corp. Severance Pay Plan, 431 F.3d 170, 176 (4th Cir. 2005) ("Even if the plan generally confers discretion on the administrator to interpret its terms, such discretion does not confer discretion to alter the plan's terms or to read out unambiguous provisions."), abrogation on other grounds recognized by Champion v. Black & Decker (U.S.) Inc., 550 F.3d 353 (4th Cir. 2008).

Finally, Plaintiffs argue that a denial of benefits would (1) violate ERISA's statutory non-forfeiture provisions and (2) otherwise discriminate unlawfully on the basis of marital status. Neither argument has any merit.

It is true, as Plaintiffs note, that ERISA provides that "[a] right to an accrued benefit derived from employer contributions shall not be treated as forfeitable solely because the plan provides that it is not payable if the participant dies (except in the case of a survivors annuity which is payable as provided in section 1055 of this title)." 29 U.S.C. § 1053(a)(3)(A). Far from prohibiting any plan provision that restricts payment of benefits upon a participant's death, this section expressly prohibits them when based "solely" because of

the participant's death. Contingent benefits (such as those in the present case) are permitted unless they are expressly exempted. See Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 511 n.8 (1981) ("[ERISA] expressly exempts from its forfeiture ban offsets that . . . are contingent on the employee's death, 29 U.S.C. § 1053(a)(3)(A).").

Further, while the Retirement Equity Act of 1984 requires that an ERISA plan provide a qualified pre-retirement survivor annuity "to the surviving spouse" of a participant, Plaintiffs have identified no requirement for the payment of any pre-retirement death benefit to an unmarried participant who dies before his or her Annuity Starting Date. See Pub. L. No. 98-397, Title I § 103(a), 98 Stat. 1429 (August 23, 1984); 29 U.S.C. § 1055(a)(2) (providing that "in the case of a vested participant who dies before the annuity starting date and who has a surviving spouse, a qualified preretirement survivor annuity shall be provided to the surviving spouse of such participant"); 26 U.S.C. § 401(a)(11)(A)(ii) (providing requirement of joint and survivor annuity and pre-retirement benefit only where vested participant who dies before the annuity start date is married).

Taking into consideration the Booth factors, the court finds no evidence that the Benefits Committee abused its discretion in deciding whether to pay Plaintiffs benefits under

22

the Plan. The Benefits Committee applied the language of the Plan defining benefits as well as the limitations on those benefits, it considered the materials submitted by Plaintiffs, it supported its decision with a reasoned and principled decisionmaking process that was consistent with other Plan provisions, and the decision was consistent with the procedural and substantive requirements of ERISA. Moreover, taking into account the conflict of interest, the court finds no evidence that the conflict would change this result. The record demonstrates that Pitney Bowes provided Barker with the proper forms to have permitted him to timely implement his retirement so as to be eligible for his benefits. The company even discussed possible retirement with Barker on July 17, 2006, but Barker stated that he was not sure he would be retiring (noting that he was waiting to see if he could participate in a clinical trial at Duke University). (A.R. at 211.) As noted, however, Barker's competing concern about continuing his disability and health care appears to have influenced his delay. (Id.) In any event, the question is not a close one, and thus any conflict could not rise to even providing a "tiebreaker." Utilizing the combination of factors under Booth and Glenn, therefore, the court finds that the Plan did not abuse its discretion in denying Plaintiffs' benefits.

## III. CONCLUSION

For the reasons noted herein, the court finds that Plaintiffs have failed to demonstrate a genuine issue of material fact and that Defendants are entitled to judgment as a matter of law.

IT IS THEREFORE ORDERED that Defendants' motion for summary judgment (Doc. 21) be GRANTED.

The parties have moved for statutory attorneys' fees but have not addressed the request in their briefing. Any motion for attorneys' fees should be filed pursuant to Fed. R. Civ. P. 54(d). The court directs the parties' attention to local rule 54.2, which sets out procedural requirements regarding awards of statutory attorneys' fees.

A separate Judgment will issue.


      /s/ Thomas D. Schroeder
      United States District Judge

November 17, 2010